In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1843

BRIAN BARRY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CBOE GLOBAL MARKETS, INC.; CBOE FUTURES EXCHANGE, LLC; and CBOE EXCHANGE, INC.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18 CV 4171 — **Manish S. Shah**, *Judge*.

ARGUED NOVEMBER 30, 2020 — DECIDED JULY 27, 2022

Before EASTERBROOK, WOOD, and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. This appeal requires us to determine whether Cboe (an initialism used by the Chicago Board Options Exchange and its affiliates) violated the Securities Exchange Act of 1934 or the Commodity Exchange Act by trading options and futures based on a number, called VIX,

designed to estimate the near-term volatility in the Standard & Poors 500 Index of stocks.

Plaintiffs are traders who contend that unknown entities (the "Doe Defendants") bought or sold options on the Wednesdays that the VIX contracts settled, in order to affect the VIX and increase their profits at the expense of honest traders. The Doe Defendants have not been identified, leaving the plaintiffs (who we call the Traders) to proceed against Cboe (as we call all three defendants). The Traders' claim under the Securities Exchange Act is that Cboe knew that scoundrels could take advantage of the formula for determining VIX on the settlement dates. The Commodity Exchange Act claim is that Cboe failed to enforce rules forbidding manipulation. The district court dismissed the Traders' initial complaint but allowed them to try again. 390 F. Supp. 3d 916 (N.D. Ill. 2019). Then it dismissed the Traders' amended complaint with prejudice. 435 F. Supp. 3d 845 (N.D. Ill. 2020). Claims against the Doe Defendants are technically open, but the district court entered a judgment under Fed. R. Civ. P. 54(b) wrapping up the litigation against Cboe.

VIX, which is short for Volatility Index, began life as a number computed by Cboe and posted every 15 seconds. The number rises when the Standard & Poors Index is expected to become more volatile in the coming 30 days and lower when it is expected to become less volatile. Initially the calculation rested on options prices in just four stocks. (Under the Black-Scholes option-pricing formula, anticipated volatility can be inferred from the behavior of options prices, if the market is competitive.)

In 2003 Cboe made VIX more reliable and replicable (or so it thought) by increasing the number of options in the formula

from 4 to 130. The Traders say that this change enabled traders to buy or sell out-of-the-money options strategically and affect the VIX at slight cost to themselves. In 2004 Cboe created futures contracts based on the VIX, and in 2006 it created options contracts. As the Traders see things, the creation of these derivative instruments made it possible for manipulators to make money by last-minute trades in thinly traded options among the large number that affect the index. The Traders say that this possibility has been realized and point to a study finding suspicious patterns of trades and price movements. John M. Griffin & Amin Shams, *Manipulation in the VIX?*, 31 Review of Financial Studies 1377 (2018). But the Traders do not say that Cboe knew in 2003, 2004, or 2006 that this would happen; nor do the Traders say that Cboe is bound to agree with the conclusions in the Griffin & Shams paper. Instead they say that Cboe should have known that including more options in the process of determining VIX increases the risk of manipulation and that, when unusual patterns developed, Cboe should have taken more rigorous enforcement actions. The Traders acknowledge that Cboe did take some enforcement actions, but they call them inadequate.

Our description of the VIX, and how the 2003 changes increased the risk of manipulation, is skeletal. The district court's opinions supply more detail, as does the Griffin & Shams paper. We do not go into specifics, however, because technical issues do not affect the resolution of this appeal. Nor do we discuss all of the many legal issues that the parties have briefed. Instead we cut straight to the matters that we deem dispositive.

To prevail under the Securities Exchange Act, which applies to options on the VIX, the Traders must establish that

Cboe committed fraud. Intent to deceive ("scienter") is among the requirements for a suit under §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and the SEC's Rule 10b–5, 17 C.F.R. §240.10b–5. And under the Private Securities Litigation Reform Act of 1995 a suit must be dismissed unless the complaint shows that the forbidden intent is at least as likely as its absence. 15 U.S.C. §78u–4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). One more relevant rule: private litigants cannot pursue claims based on a theory that the defendants aided and abetted a wrongdoer; only an entity that has done wrong itself can be liable. *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). The district court found that the complaint's allegations of intent fall short under *Tellabs* and that the Traders lose for the additional reason that Cboe did not perform any of the manipulation.

The district judge explained the latter problem:

[The Traders'] theory is that Cboe knew that its products were vulnerable to manipulation and, later, that manipulation was occurring. By failing to act, plaintiffs say, Cboe allowed the Doe Defendants to manipulate the market, which caused plaintiffs harm. That is secondary-liability reasoning. See *Damato v. Hermanson*, 153 F.3d 464, 471 n.8 (7th Cir. 1998) (noting that aiding-and-abetting liability "reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do" (quoting *Central Bank*, 511 U.S. at 176)).

435 F. Supp. 3d at 864. The Traders accuse Cboe of negligence in designing the index and further neglect in failing to stop persons who took advantage of the design. The latter part of the claim, at least, is barred by the holdings of *Stoneridge* and *Central Bank of Denver*. As for the former part, the design

decision: negligence, which is to say failure to do what a reasonable person ought to have done, is not enough to succeed under the Securities Exchange Act.

It is difficult to see more than negligence on Cboe's part. The Traders contend that scienter may be inferred from the fact that Cboe made money on the trades that the Doe Defendants may have used to manipulate inputs into calculation of the VIX. But the Traders do not quantify how much Cboe stood to lose in trading of the VIX options and futures contracts themselves. The VIX was a success, whose market grew from $200 billion in 2006 to $1.6 trillion in 2016. Between 2010 and 2018 Cboe's stock price tripled. 435 F. Supp. 3d at 857. Traders in VIX are sophisticated investors, who could learn about manipulation (perhaps directly from the Doe Defendants) and would curtail their own trading if they thought that they could be taken advantage of. The Traders' observation that Cboe could gain from the options traded in an effort to affect VIX does not help their position without a comparison against what Cboe stood to lose. As far as we can see, potential losses outweighed potential gains, making it implausible to attribute wrongful intent to Cboe. That Cboe engaged in some anti-manipulation enforcement action makes the imputation of fraudulent intent even harder. *Tellabs* thus resolves the Securities Exchange Act claim in Cboe's favor.

This brings us to the Traders' claim under the Commodities Exchange Act. Section 7 of that Act (we use the section numbers in the U.S. Code rather than the enacting legislation) requires any "contract market" designated by the Commodity Futures Exchange Commission, a category that includes Cboe, to trade "only contracts that are not readily susceptible to manipulation." 7 U.S.C. §7(d)(3). How susceptible is

"readily" susceptible is a matter committed to the CFTC, for §7 is enforced by the agency. There is no express private right of action—and the CFTC has not accused Cboe of violating §7(d)(3) by designing the VIX or trading futures contracts on that index. Manipulation by traders is forbidden by 7 U.S.C. §9(1), but this rule too is enforced by the CFTC, see §9(4)(A), and at all events no one has identified the Doe Defendants. This leads the Traders to rely on §25 of the Act, which creates a private right of action against contract markets.

Section 25(b)(1)(A), 7 U.S.C. §25(b)(1)(A), provides that any board of trade that fails to enforce a rule that the CFTC requires it to enforce—including the rule against trading manipulable contracts—"shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such registered entity to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaws, rules, regulations, or resolutions." This language creates a problem for the Traders; the reference to "such transaction" implies a need to identify trades on which manipulation caused losses. The district court ruled that the Traders had not done this. 435 F. Supp. 3d at 868–74. Instead of addressing that subject, however, we focus on a different requirement: "A person seeking to enforce liability under this section must establish that the registered entity … acted in bad faith in failing to take action or in taking such action as was taken". 7 U.S.C. §25(b)(4). For the same reason that the complaint does not show scienter for the purpose of securities-law liability, it is hard to see how it alleges "bad faith".

The Traders do not seriously try to show that Cboe acted in bad faith as that phrase is normally understood in law.

Instead they observe that *Bosco v. Serhant*, 836 F.2d 271, 276–78 (7th Cir. 1987), equates "bad faith" in this statute with negligence—and, if negligence is the standard, then the complaint is sufficient. The district judge thought that *Bosco* tied his hands on this issue, 390 F. Supp. 3d at 936, but we do not deem *Bosco* dispositive.

*Bosco* dealt with a fraud by a trader who raised money in units of $100,000, promising to invest $97,000 of each unit in safe instruments while using the remaining $3,000 as a hedge. In fact he invested 100% of each unit in risky futures contracts, lost money rapidly, and diverted new investors' money to make the earlier investors think that they were making profits. In other words, he ran a Ponzi scheme, which the Chicago Mercantile Exchange did not detect until more than $20 million of investors' funds been lost. The Mercantile Exchange was among the defendants in the ensuing litigation. (Serhant, who ran the scam, was obviously liable, but by then he was in prison and could not pay any adverse judgment.) A jury returned a modest verdict against the Mercantile Exchange and larger verdicts against other defendants. We ruled in the Mercantile Exchange's favor on the merits.

Section 25(b)(4) and its requirement of "bad faith" did not matter in *Bosco* for two reasons. First, §25(b)(4) had been enacted after Serhant's scheme collapsed, and as it is not retroactive the court deemed it irrelevant. 836 F.2d at 276 (stating that the court proceeded under the Act as it stood before 1982). *Bosco* instead recognized a private right of action to enforce one of the Mercantile Exchange's rules, then decided in the Exchange's favor under that rule. In other words, the discussion of §25(b)(4) was doubly dictum, first because the statute was inapplicable and second because the Mercantile

Exchange prevailed on other grounds. Dictum matters when it possesses the power to persuade—but only when it persuades. It is not authoritative. And the dictum in *Bosco* does not persuade.

*Bosco* itself explains why: "In ordinary English 'bad faith' implies a deliberate wrong rather than just failing to come up to an objective standard of care, which is what negligence is." 836 F.2d at 276. See also *Black's Law Dictionary* 171 (11th ed. 2019). A court would be justified in departing from that meaning if something in the text or structure of §25 implied that the phrase had a special meaning, but the Commodity Exchange Act does not define the phrase, and equating it with negligence is inconsistent with the statute's structure.

Normally self-regulatory organizations such as contract markets possess a form of delegated prosecutorial discretion and are no more liable for non-enforcement decisions than the CFTC or the Department of Justice would be. See, e.g., *Heckler v. Chaney*, 470 U.S. 821 (1985) (non-review of prosecutorial non-enforcement decisions); *Standard Investments Chartered, Inc. v. National Association of Securities Dealers, Inc.*, 637 F.3d 112, 116 (2d Cir. 2011) (immunity of trading organizations). Section 25, alone among provisions in the Commodity Exchange Act, authorizes liability for a market's non-enforcement decision, but by using the phrase "bad faith" makes that review narrower than the negligence or strict liability standards would do. Indeed, the point of §25 was to supersede *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982), which had implied a private right of action under the Commodity Exchange Act, by substituting an express right of action with limitations.

We could imagine saying that "bad faith" is an ambiguous phrase whose meaning may be illuminated by legislative history, but none of the legislative documents behind §25(b)(4) equates "bad faith" with negligence. The relevant committee reports say that "bad faith" is being used as a limitation to prevent the right of action implied in *Curran* from doing damage to the futures exchanges and their regulatory apparatus. See, e.g., H.R. Rep. No. 97-565, Part 1, at 56 (1982).

*Bosco* did not discuss the statutory text, context, or history. Instead it drew a negligence standard from decisions under judicially created private rights of action. The job of a court interpreting a statute, however, is to interpret *the statute* rather than the work of other judges—especially when the statutory text is designed to displace the judiciary's handiwork.

The Second Circuit, which has jurisdiction over the other principal futures exchanges in this nation, understands "bad faith" in §25(b)(4) in the traditional way. *Sam Wong & Son, Inc. v. New York Mercantile Exchange*, 735 F.2d 653, 670 (2d Cir. 1984) (Friendly, J.), dealt with an exchange's asserted failure to enforce rules against price distortions. The Second Circuit thoroughly explored the meaning of "bad faith" under §25(b)(4), concluding that a plaintiff sufficiently pleads a violation if it alleges that "self-interest or other ulterior motive unrelated to proper regulatory concerns … constitute[s] the sole or the dominant reason for the exchange action". See also *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 780 (2d Cir. 1984) ("A claim of bad faith must be supported by two allegations: first, that the exchange acted or failed to act with knowledge; and second, that the exchange's action or inaction was the result of an ulterior motive.") *Bosco* cited *Sam Wong* but did not analyze its holding

or rationale, instead treating it as limited to situations in which the exchange injured a trader by a discretionary action. 836 F.2d at 278. That's not how Judge Friendly saw things, nor can a discretionary vs. nondiscretionary distinction be found in §25(b)(4). *Ryder* was not cited at all in *Bosco*. The result was an accidental conflict among the circuits.

Because the treatment of §25(b)(4) in *Bosco* was dictum, it can be disapproved without the need for formal overruling under Circuit Rule 40(e). We now deprecate the portion of *Bosco* that unnecessarily discussed §25(b)(4), and we bring to an end the conflict between this court and the Second Circuit.

The Traders' allegations do not imply bad faith under the ordinary meaning of that phrase, and they do not satisfy the Second Circuit's elaboration. That is to say, the Traders do not allege that Cboe acted with *knowledge* of manipulation (the Traders rely on a "should have known" approach) and do not contend that Cboe was in cahoots with the Doe Defendants (an "ulterior motive"). The Traders have a negligence claim, which does not support their suit under either the Securities Exchange Act or the Commodity Exchange Act. Remedies, if any are appropriate, lie with the SEC, the CFTC, and the National Futures Association (which could expel or discipline its members) rather than the judiciary at the behest of private litigants.

AFFIRMED