**In re FINANCIAL PARTNERS, LTD.,
Financial Partners Brokerage, Ltd.,
and Robert B. Serhant, Debtors.**

**Leroy G. INSKEEP, as
Trustee, Plaintiff,**

**v.**

**Dan GROSSO, Alfred DiMonte, Antonette DiMonte, Phyllis DiMonte
and Emil Barbato, Defendants.**

**Bankruptcy Nos. 82 B 14353, 82 B
14354, 82 B 14613, 84 A 1251
and 84 A 1253.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Oct. 31, 1989.

Opinion on Denial of Reconsideration and
Motion to Amend Judgment
July 26, 1990.

---

Leroy G. Inskeep, Philip V. Martino, Rudnick & Wolfe, Chicago, Ill., for plaintiff.

Eugene A. DiMonte, DiMonte & Lizak, Park Ridge, Ill., for defendants.

MEMORANDUM OPINION REGARDING THE MOTION OF THE TRUSTEE FOR SUMMARY JUDGMENT AND THE CROSS MOTION OF THE DEFENDANTS FOR SUMMARY JUDGMENT

SUSAN PIERSON DeWITT, Bankruptcy Judge.

This matter comes before the Court on the Motion of the Trustee for Summary Judgment, the Memorandum in Support of

the Trustee's Motion for Summary Judgment, the Joint Stipulation of Facts and Documents, the Objections of the Adversary Defendants, Dan Grosso, Alfred DiMonte, Antonette DiMonte, Phyllis DiMonte and Emil Barbato, (collectively "the Defendants") to the Trustee's Motion for Summary Judgment,[1] the Motion of the Adversary Defendants for Summary Judgment, the Rule 12(f) Statement of Genuine Issues of Material Fact,[2] the Trustee's Reply Memorandum in Further Support of His Motion for Summary Judgment and Memorandum in Opposition to the Defendants' Motion for Summary Judgment, the Adversary Defendants' Reply Memorandum to the Trustee's Memorandum in Opposition to the Defendants' Motion for Summary Judgment, and the Affidavits of Frank Przespolewski and Leroy Inskeep. Now, therefore, for the reasons set forth below, the Trustee's Motion for Summary Judgment is granted, and the Defendants' Cross Motion for Summary Judgment is denied.

### Facts

On October 22, 1982, Financial Partners, Ltd. ("Financial"), an Illinois corporation organized to act as a financial consultant, advisor and business broker, and Financial Partners Brokerage, Ltd. each filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. Shortly thereafter, on October 29, 1982, Robert Serhant, an officer, director and shareholder of Financial, filed his Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. The only other officers, directors and shareholders of Financial were Ralph F. Del Monico and Lawrence B. LaGrotteria. Financial also employed numerous other people.

On October 21, 1980 and on September 15, 1981, Grosso, an investor, deposited $53,000 and $25,000 respectively with Financial to be used to purchase T–Bills and T–Bill futures contracts. On October 1, 1981, Grosso authorized Financial to invest the $1,000 in interest which had accrued on his investments, and on October 5, 1981, Grosso authorized Financial to invest an additional $2,000 in interest which had accrued on his investments. Each time the funds were to be used to purchase T–Bills and T–Bill futures contracts. On June 1, 1982, Grosso deposited an additional $28,000 with Financial to purchase T–Bills and commodity future contracts which matured on August 16, 1982.

From January 21, 1981 through June 9, 1982, Grosso received and negotiated checks drawn on Financial's custodial account totalling $52,945.60, of which he reinvested $5,017.50. On August 16, 1982, Grosso received and negotiated another check from Financial for $28,000 drawn on the same account.

On February 12, 1981 Phyllis DiMonte ("DiMonte") deposited $10,000 with Financial to be used to purchase T–Bills and T–Bill futures contracts, and on November 17, 1981, she deposited an additional $3,000 with Financial to be used for the same purpose. On June 2, 1982, DiMonte deposited $13,000 with Financial to purchase T–Bills and commodity future contracts which matured on August 24, 1982.

From March 12, 1981 through June 2, 1982, Phyllis DiMonte received and negotiated checks drawn on Financial's custodial account totalling $6,721.50. On August 27, 1982, Phyllis DiMonte received and negotiated another check drawn on the same account for $1,228.50.

On September 15, 1980, Alfred DiMonte and Antonette DiMonte (the "DiMontes") deposited $15,000 with Financial to be used to purchase T–Bills and T–Bill futures contracts, and on January 8, 1981 the DiMontes deposited $10,000 with Financial for the same purpose. On November 17, 1981, the DiMontes deposited an additional $3,000 with Financial to be used to pur-

---

1. The Defendants' pleading is incorrectly titled "Objections of Adversary Defendants to the Trustee's Motion for Summary Judgment." The pleading should be titled "Response to the Trustee's Motion for Summary Judgment."

2. The Defendants incorrectly state that their Statement of Genuine Issues of Material Fact is filed pursuant to Local Rule 12(f). The correct reference is to Local Rule 12(m).

chase T–Bills and T–Bill futures contracts, and on June 2, 1982, the DiMontes deposited $13,000 with Financial to purchase T–Bills and commodity future contracts which matured on August 24, 1982.

From February 2, 1981 through June 14, 1982, the DiMontes received and negotiated checks which were drawn on Financial's custodial account totalling $17,186. Additionally, on August 27, 1982, the DiMontes received and negotiated two checks drawn on Financial's custodial account for $1,228.50 and $13,000. The checks cleared on August 30, 1982.

On June 28, 1981, Emil Barbato ("Barbato") deposited $2,000 with Financial to be used to purchase T–Bills and T–Bill futures contracts, and on November 23, 1982, Barbato deposited $15,000 with Financial for the same purpose. On June 2, 1982, Barbato deposited $17,000 with Financial to purchase T–Bills and commodity future contracts which matured on August 24, 1982. Sometime prior to August 27, 1982, Barbato deposited an additional $25,000 with Financial.

From February 11, 1981 through June 9, 1982, Barbato received and negotiated checks drawn on Financial's "custodial account" at the Berwyn National Bank ("Bank"), totalling $17,829.50, and on August 27, 1982 he received and negotiated two additional checks drawn on the same account for $1,606.50 and $12,000. The last two checks cleared on August 30, 1982.

Financial used the custodial account for the sole purpose of depositing its clients' funds and repaying its clients. As is the standard and customary business practice, a separate ledger was prepared and kept for each client whose funds were deposited into the custodial account. From July 6, 1982 until September 23, 1982, the custodial account was continuously overdrawn. The overdraft ranged from $79,674.49 on July 6, 1982 to $662,195.19 on September 7, 1982. Neither the Defendants or Financial ever intended for title to the funds in the custodial account to pass to Financial. Additionally, Financial maintained a separate "operating account" at the Bank to pay its business expenses.

In essence, Serhant was operating an investment program pursuant to which customers would deposit funds with Financial to be used to purchase T–Bills and T–Bill futures contracts in the customers' names. In fact, however, the money received was not invested as set forth above. Instead, Serhant used the funds to purchase a high percentage of T–Bill futures contracts in the customers' names or cover margin calls on contracts already purchased. Serhant was charged with and pleaded guilty to a crime involving the wrongful use of clients' funds, and he was sentenced to eleven years in prison. No other officer, director, shareholder or employee of Financial was indicted.

The investors filed several lawsuits against Serhant, Financial and Financial Partners Brokerage, Ltd, including a class action suit in the United States District Court for the Northern District of Illinois. The Defendants herein are unnamed plaintiff class members in the class action. The class action suit was tried before a jury, and the jury returned a verdict in favor of the plaintiff class and against Serhant. The jury found that Serhant violated the Commodities Exchange Act, the Racketeer Influenced and Corrupt Organizations Act, and the Illinois Consumer Fraud and Deceptive Practices Act and breached his fiduciary duty. The jury also found that Financial and Financial Partners Brokerage, Ltd. violated the Commodities Exchange Act and the Illinois Consumer Fraud and Deceptive Practices Act, and breached their fiduciary duty. The Defendants filed proofs of claim to the approximately $8,000,000.00 in the class action judgment and settlement pool. The claims of Grosso and the DiMontes were denied, however, because they received a net profit from the investment program. Barbato's and Phyllis DiMonte's claims were allowed, and they have received an initial distribution from the class action proceeds.

On appeal, the Seventh Circuit Court of Appeals upheld the jury verdict in pertinent part. The Court limited any further recovery of compensatory damages because the plaintiffs had been more than fully compen-

sated by the settlements. The Court, however, did not limit the recovery of any punitive damages. *Bosco v. Serhant*, 836 F.2d 271 (7th Cir.1987).

The Trustee alleges that the total claims against Financial exceed $25,000,000. Excluding attorneys fees and Trustee's fees, the priority claims allegedly exceed $314,-000. According to the Trustee, the estate is valued at $725,000 and consists almost entirely of proceeds from preference actions and fraudulent conveyance actions.

On October 29, 1984, the Trustee filed an adversary proceeding against each of the Defendants seeking to avoid the payments made by Financial to the Defendants within the ninety days preceding the filing as preferences under Section 548 of the Bankruptcy Code. In response, the Defendants allege five affirmative defenses. First, the Defendants argue that the funds are not property of the estate. Second, the Defendants contend that there is no antecedent debt, and third, the Defendants argue that the payments were made in the ordinary course of business and thus, are not subject to the Trustee's avoidance powers. Fourth, the Defendants argue that the trustee is estopped from recharacterizing the transactions between the parties, and fifth, the Defendants contend that the Trustee cannot avoid the transfers because of Financial's unclean hands. The Plaintiff and the Defendants each filed a Motion for Summary Judgment, and they fully briefed each Motion.

### Standard of Review

The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact. *Farris v. Standyne/Chicago Div.*, 832 F.2d 374, 379 (7th Cir.1987). In on a summary judgment motion, therefore, the inference to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Moreover, even if a material fact exists, the pretrial dispute is sufficient only if it is determina-

tive of the outcome under the applicable law. *Id.*

As a result of the standards set forth, a party seeking summary judgment must bear the initial responsibility of informing the court of the basis for its motion which the party believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the action for summary judgment is made and supported, Rule 56(e) provides that a party opposing the motion must set forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511. The Court, having reviewed the pleadings and affidavits submitted, finds that there are no genuine issues of material fact, and therefore, the Trustee's Motion for Summary Judgment must be granted, and the Defendants' Cross Motion for Summary Judgment must be denied.

### Analysis

Section 547 of the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of the transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Trustee carries the burden of proving the five elements of a preference action. *In re Bullion Reserve of North America,* 836 F.2d 1214, 1217 (9th Cir.1988), *citing, Grover v. Gulino (In re Gulino),* 779 F.2d 546, 549 (9th Cir.1985). Once the trustee has met his burden, the burden shifts to the transferee to prove that the preferential transfer falls within one of the statutory exceptions to the trustee's avoiding power. *In re Allegheny,* 86 B.R. 466, 469 (Bankr.W.D.Pa.1988), *citing, Bullion Reserve,* 836 F.2d at 1217; *In re Fasano/Harriss Pie Co.,* 71 B.R. 287 (W.D. Mich.1987); *In re Western World Funding, Inc.,* 54 B.R. 470 (Bankr.D.Nev.1985); *In re Independent Clearing House Co.,* 41 B.R. 985, *rev'd,* 77 B.R. 843 (D.Utah 1987); *In re Haynes,* 28 B.R. 136 (Bankr.M.D. Tenn.1983).

In this case, the only element that is undisputed is that the transfers occurred within ninety days from the date the Petition was filed. The Court will address the remaining contested elements separately.

### A. Property of the Estate.

The Trustee alleges that the funds deposited by the Defendants are property of the estate pursuant to Section 764(a) of the Bankruptcy Code. The Defendants, however, allege that the funds are not property of the estate because Financial is not a commodities broker, because Financial held the funds as the trustee in an express trust, and because the parties never intended for title to the funds to pass to Financial.

Section 764 of the Bankruptcy Code, which applies to commodity broker liquidations, provides:

(a) Except as otherwise provided in this section, any transfer by the debtor of property that, but for such transfer, would have been customer property, may be avoided by the trustee, and such property shall be treated as customer property, if and to the extent that the trustee avoids such transfer under section 544, 545, 547, 5487, 549 or 724(a) of this title. For the purpose of such sections, the property so transferred shall be deemed to have been property of the debtor, and if such transfer was made to a customer or for a customer's benefit, such customer shall be deemed, for purposes of this section, to have been a creditor.

Section 101(5) of the Bankruptcy Code defines a commodity broker as a "futures commission merchant, foreign futures commission merchant, clearing organization, leverage transaction merchant, or commodities option dealer, as defined in section 761 of this title, with respect to which there is a customer, as defined in 761(9) of this title." 11 U.S.C. § 101 (1982). Section 761(8) of the Bankruptcy Code provides that futures commission merchant shall have the same meaning as it has in the Commodities Exchange Act. 11 U.S.C. § 761 (1982). In turn, the Commodities Exchange Act provides:

The words "futures commission merchant" shall mean and include individuals, associations, partnerships, corporations, and trusts engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades of contracts that result or may result therefrom.

7 U.S.C. § 2 (1980 and Supp.1989).

In this case, the parties stipulated that Financial was in business as a broker for the purpose of purchasing T–Bills and commodity future contracts. Additionally, the Defendants state in their Answers that the funds were deposited with Financial for the sole and limited purpose of purchasing specific commodity securities. Accordingly, for the purposes of Section 764, Financial is a futures commission merchant and thus a commodity broker, and Section 764(a) applies. Therefore, the funds are

property of the estate, and the Defendants are creditors of the estate.

■ The Defendants cite the *Bosco* case in support of their position that Financial is not a commodity broker. In *Bosco*, the Seventh Circuit held:

> To do the actual trading of the futures, *Serhant* needed the services of a clearing member of the exchange whose function is to guarantee that each party to a trade will make good on his commitment and a futures commission merchant ... For most of the period of fraud, *Serhant* used K & S Commodities, Inc. as both his clearing agent and futures commission merchant ...

836 F.2d at 273 (emphasis added).

The federal courts have authority to take judicial notice of proceedings in other courts, either within or without the federal system, provided that those proceedings are directly related to matters presently at issue. *Allegheny*, 86 B.R. at 469. In this case, the Defendants argue that Financial is not a commodity broker because Serhant used K & S as his clearing member and futures commission merchant. While the Court will take judicial notice of the Seventh Circuit's finding, the Court finds the Defendants' argument to be without merit.[3] Just because Serhant used K & S as his futures commission merchant does not mean that Financial is not a futures commission merchant. The Seventh Circuit did not say that Financial was not a futures commission merchant and thus not a commodity broker. All the Seventh Circuit said was that Serhant used a different futures commission merchant, to commit fraud.

### B. On Account of An Antecedent Debt.

The Trustee alleges that the payments to the Defendants were on account of an antecedent debt because Financial became obligated to repay the Defendants the day each of them deposited the funds. The Defendants, on the other hand, argue that Financial was not obligated to repay them until the T–Bills and commodity future contracts matured. Accordingly, the Defendants contend that there is no antecedent debt.[4]

■ The Bankruptcy Code does not define antecedent debt. Section 101(11) does, however, define debt as a "liability on a claim." 11 U.S.C. § 101 (1982). The terms debt and claim are coextensive. If a creditor has a claim against the debtor, the debtor owes a debt to the creditor. H.R. Rep. No. 595, 95th Cong., 1st Sess. 310, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6267; S.Rep. No. 989, 95th Cong., 2d Sess. 23, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5809; *see also Bullion Reserve*, 836 F.2d at 1219. In *In re Demetralis*, the bankruptcy court held:

> There is a clear majority rule on the question of when a debt is incurred for preference purposes. Most courts, including the United States Court of Appeals for the Seventh Circuit and this court, have held a debt is incurred for purposes of Section 547(c)(2) when the debtor becomes legally obligated to pay.

57 B.R. 278, 281 (Bankr.N.D.Ill.1986).

Accordingly, the next question to be answered is when did Financial become legally obligated to pay the Defendants.

■ In *Bullion Reserve*, the Ninth Circuit addressed an analogous situation to the one presented here. In that case, the trustee brought an adversary proceeding against investors to recover preferences.

---

3. The Defendants also argue that if the Court finds that Financial is a commodities broker, pursuant to Section 764(a) of the Bankruptcy Code, the Court should find Section 764 unconstitutional because it deprives them of vested property without due process of law and impairs their right to contract in violation of the Fifth Amendment of the Constitution. The Court finds this argument to be without merit and will not address it in this decision.

4. The Trustee states, by way of footnote, that if the Defendants contend there is no antecedent debt, then he moves to amend his Complaint to include an action for fraudulent conveyance. Pursuant to Section 546(a) of the Bankruptcy Code, however, the Trustee is barred from commencing an action for fraudulent conveyance because more than two years from the date of his appointment has elapsed.

The investors deposited funds with the debtor who agreed to purchase and store gold bullion. As in this case, the investors argued that there was no antecedent debt. The Court, however, stated:

This argument ignores the Bankruptcy Code's broad definitions. A "creditor" is defined as an "entity that has a claim against the debtor." ... The legislative history of the Bankruptcy Code indicates that Congress intended to provide the broadest possible definition of "claim" when it enacted § 101(4) ...

Under these definitions, it is clear that [the investor] became a creditor when he transferred funds to [the debtor] for the purchase of bullion. At that moment [the investor] accrued a right to demand bullion from [the debtor]. This right, although unmatured, constituted a "claim" under the Bankruptcy Code.

836 F.2d at 1218. Accordingly, the Court finds that Financial became obligated to repay the Defendants on the day they advanced it funds. Therefore, there was an antecedent debt.

C. Debtor Insolvent at the Time of the Transfer.

The Trustee correctly states that, in accordance with Section 547(f) of the Bankruptcy Code, Financial is presumed insolvent in the ninety days preceding the filing. In support of the presumption, the Trustee alleges that the claims in the estate exceed the available funds in the estate. The Defendants, however, argue that it is premature to determine whether Financial was insolvent because there has not been a distinction made between the three estates, and because the Court ruled that the substantive consolidation of the estates was without prejudice to the Defendant's defenses. Additionally, the Defendants argue that, in accordance with the *Bosco* decision, all of the claims must be denied because the Seventh Circuit held that the

class action plaintiffs were more than compensated by the settlements because they exceeded the total jury award, and therefore, the plaintiffs were entitled only to that portion of the verdict that represented punitive damages. 836 F.2d at 282.[5]

In this case, the Court finds that the Defendants have failed to overcome the presumption that Financial was insolvent within the ninety days preceding the filing of the petition. In fact, in the Joint Pretrial Statement submitted by the parties, the Defendants listed all of the elements of a preference action as contested except the insolvency element. Further, because Financial was insolvent on the date of the transfers, the Defendants received more than they would have received under a Chapter 7 liquidation.

In conclusion, the Court has reviewed the facts in the light most favorable to the Defendants and finds that there are no genuine issues of material fact as to the existence of a preference. The burden now shifts to the Defendants to establish any defenses they may have to the Trustee's avoidance power. Accordingly, the Court will address each affirmative defense raised.

Prior to its amendment in 1984, Section 547(c)(2) provided as follows:[6]

(c) The trustee may not avoid under this section a transfer— ...

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

---

5. The Court will not address the issue of whether any of the claims must be denied until there is a proper objection to the claims before it.

6. Congress amended § 547(c)(2) in 1984 by deleting the requirement that the debtor make the transfer 45 or fewer days after incurring the debt. Pub.L. No. 98–353, § 462(c), 98 Stat. 355, 378 (1984). The 45–day requirement still applies in this case, however, because the 1984 amendments apply only to bankruptcy cases filed 90 days after July 10, 1984. *Id.* § 553, 98 Stat. 392 (1984).

(D) made according to ordinary business terms.

In order to satisfy the exception, all four elements must be met. *In re Blanton Smith Corp.*, 37 B.R. 303, 306 (Bankr.M.D. Tenn.1984).

The Defendants allege that the payments made to them were made in the ordinary course of business within 45 days from the date the debt was incurred. On the contrary, the Trustee argues that Financial was operating a Ponzi scheme, and accordingly, the ordinary course of business defense does not apply, and further the Trustee alleges that the payments were made more than 45 days after the date the debt was incurred.

Generally, a Ponzi scheme refers to:

[A]n investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*In re Independent Clearing House Co.*, 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984), *rev'd on other grounds*, 77 B.R. 843 (D.Utah 1987). Several courts have held that the operation of a Ponzi scheme is not in the ordinary course of business and therefore, the ordinary course of business defense does not apply. *See e.g., Bullion Reserve*, 836 F.2d at 1216; *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 819 F.2d 214 (9th Cir.1987). In *Bishop*, the Court held:

To apply [§ 547(c)(2) ] to immunize these activities "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." ... These defendants received funds from investments made on the eve of bankruptcy, by persons who recovered nothing. Equity requires that these creditors all share equally in whatever assets are available. If decisions such as this and *Clearing House* help to discourage these Ponzi arrangements by encouraging more careful investment activities on the part of the ordinary "consumer investors," there will be fewer defrauded creditors to sit at the defendants's table in preference suits in the future.

*Id.* at 217.

In *In re Independent Clearing House*, 77 B.R. 843 (D.Utah 1987), however, the district court reversed the bankruptcy court's finding that the ordinary course of business defense was not available because the Debtor was operating a Ponzi scheme. The Court held:

We believe that the bankruptcy court read Section 547(c)(2) too narrowly. Just because a debtor does not have a legitimate or "ordinary" business, does not mean that transfers he makes in the course of that business may not be made in the "ordinary course of business."

Further, the Court held:

We believe that, viewed in light of the statute's purpose, the transfers to defendants in this case may have been made in the "ordinary course" of the debtors' business. The debtors' business was to solicit "undertakings" from investors and to pay the undertakers according to the terms of their contracts, in order to attract new undertakers. There is nothing in the record to indicate that the payments in question were any different from any other payments on the clearinghouse contracts, that they were made according to other terms or that the underlying debts were incurred in other than the ordinary course of the debtors' admittedly fraudulent business. There is nothing to indicate that the transfers were not in conformity with the prior dealings of the parties, with the prior practice of the debtors or with the practices of others engaged in the same type of fraudulent business. Moreover, the payments did not threaten to set off a race to the courthouse. In fact, they had just the opposite effect. The race to the courthouse would have started sooner if the debtors had not made the payments in question.

77 B.R. at 874. Upon reviewing the case law, the Court finds the reasoning in *Independent Clearing House* most persuasive.

■ In this case, the Trustee argues that in *Bosco* the Seventh Circuit held that Financial was operating a Ponzi scheme. In fact, however, the Seventh Circuit held that "*[a]s in* a Ponzi scheme, Serhant was using newly invested money to make old investors think they were earning profits rather than losing their shirts." *Bosco*, 836 F.2d at 274 (emphasis added). Accordingly, the Seventh Circuit did not expressly hold that Serhant was operating a Ponzi scheme, nor did it hold that Financial was operating one. Accordingly, the Court finds that the record lacks any evidence to prove that Financial was operating a Ponzi scheme. Thus, the Court finds that the ordinary course of business defense is available. Accordingly, the Defendants must show that the payments were made in the ordinary course of business and according to ordinary business terms. A careful and considered review of the pleadings, reveals that the Defendants established that the payments were made within the ordinary course of business between themselves and Financial. The Defendants, however, failed to establish that the payments were made according to common industry practice. *See In re Financial Partners Ltd.*, 94 B.R. 537, 539 (Bankr.N.D.Ill.1988) (To determine whether a preferential transfer was made in the ordinary course of business, the Court must determine what is subjectively ordinary between the parities as they have traditionally conducted business, and the Court must determine whether the transfer was made according to common industry practice.)

Even if Financial were operating a Ponzi scheme, in light of *Independent Clearing House,* the Defendants would still need to establish that the transfers were made according to common industry practice. The record, however, is devoid of any facts which establish that it is common industry practice, where there is a Ponzi scheme, to make such transfers. Accordingly, the Court finds that the Defendants failed to establish the elements of the ordinary course of business defense. Because the

Court finds that the Defendants failed to prove that the transfers were made according to ordinary business terms, the Court will not address the remaining elements.

Additionally, the Defendants contend that the Trustee is estopped from recharacterizing the transactions between the parties from what they were, agreements for express trusts. The defendants allege that based on the Joint Stipulation, the Trustee recognizes that Financial acted as the Defendant's fiduciary. Upon reviewing the pleadings, the Court finds that the Trustee never argued that Financial was not a fiduciary. Whether Financial was a fiduciary, however, is irrelevant for purposes of Section 764(a) of the Bankruptcy Code. The funds were brought into the estate pursuant to Section 764(a) because Financial was a commodities broker, not because it was a fiduciary.

■ The Defendants also argue that the Trustee is estopped from avoiding the transfers under the doctrine of unclean hands. In *In re Best Pack Seafoods, Inc.*, the Court held that when a trustee seeks to avoid a preference, he is doing so in his representative capacity for the general unsecured creditors. 29 B.R. 23 (Bankr.D. Me.1983). Thus, the inequitable conduct of the debtor cannot be asserted as a defense to the trustee's preference action. *Id.* at 24. Accordingly, the Court finds that the Defendants' unclean hands argument is without merit.

Lastly, the Defendants argue that they are entitled to set off. The Court will address this issue, however, when it is properly before it in accordance with Section 553 of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT the Motion of the Trustee for Summary Judgment is granted, and the Cross–Motion of the Defendants for Summary Judgment is denied. IT IS HEREBY FURTHER ORDERED THAT judgment is entered in favor of the Trustee, Leroy Inskeep, and against the Defendants, Emil Barbato, Antonette DiMonte and Alfred DiMonte, Phyllis DiMonte and Dan Grosso in the amounts

of $13,606.50, $14,228.50, $1,228.50 and $28,000 respectively.

## MEMORANDUM OPINION REGARDING THE MOTION FOR RECONSIDERATION AND TO AMEND JUDGMENT

SUSAN PIERSON SONDERBY,
Bankruptcy Judge.

This matter comes before the Court on the Motion of the Adversary Defendants, Dan Grosso, Alfred DiMonte, Antonette Di-Monte, Phyllis DiMonte, and Emil Barbato, (collectively "the Defendants") for Reconsideration and to Amend the Judgment, the Memorandum of the Trustee in Response to the Defendants' Motion for Reconsideration, the Defendants' Reply to the Trustee's Response, the Defendants' Supplemental Brief in Support of the Motion, and the Trustee's Response to the Defendants' Supplemental Brief. Now, therefore, for the reasons set forth below, the Defendants' Motion for Reconsideration and to Amend the Judgment is denied.

The facts of this case are clearly set forth in the Memorandum Opinion dated October 31, 1989, and need not be repeated here. That Opinion granted the Trustee's Motion for Summary Judgment and ordered the Defendants to return amounts received from Financial Partners, Ltd. ("Financial") prior to the Chapter 7 filing.

### Standard of Review

■ Motions for reconsideration serve a limited purpose, to correct manifest errors of law or fact or to consider the import of newly discovered evidence. *Publishers Resource, Inc. v. Walker–Davis Publications,* 762 F.2d 557 (7th Cir.1985); *Keene Corp. v. International Fidelity Ins. Co.,* 561 F.Supp. 656 (N.D.Ill.1982), *aff'd,* 736 F.2d 388 (7th Cir.1984). The Court has reviewed the Motion submitted and finds that the Defendants failed to demonstrate any manifest errors in law or fact and failed to produce any newly discovered evidence. Accordingly, the Motion for Reconsideration is denied.

### Analysis

In the Motion for Reconsideration, the Defendants argue that the Court should not have granted summary judgment to the Trustee because Financial was not a "commodities broker" subject to Section 764 of the Bankruptcy Code. In response, the Trustee argues that the Defendants are not raising any new issues or facts that were not available at the time the Motions for Summary Judgment were presented and briefed.

■ Section 101(5) of the Bankruptcy Code provides that a "commodity broker" is a futures commission merchant as defined in Section 761 of the Bankruptcy Code. Section 761 states that "futures commission merchant" will have the meaning assigned to it in the Commodity Exchange Act, 7 U.S.C. Section 2 which provides:

> "[t]he words "futures commission merchant" shall mean and include ... corporations ... engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery <u>on or subject to the rules of any contract market</u>...." (emphasis added).

The Defendants contend that the underlined words require that a futures commission merchant be a member of a contract market. This Court finds that the underlined language does not require a futures commission merchant to be a member of a contract market, instead it requires that any "commodity for future delivery" be "on or subject to the rules of any contract market...."

In support of their argument that a futures commission merchant must be a member of a contract market the Defendants cite *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,* 608 F.2d 175 (5th Cir.1979), *In Re Bucyrus Grain Co., Inc.,* 67 B.R. 336 (Bankr.D.Kan. 1986), and *In Re Bengal Trading Corp.,* 12 B.R. 695 (Bankr.S.D.Fla.1981).

In the *Rasmussen* case, an investment advisor placed commodity trades for customers with a registered commodity broker. As compensation, the advisor received a percentage of the net profit at the

closeout of each trade. A customer brought suit against the advisor for, among other counts, violation of the Commodity Exchange Act, 7 U.S.C. Section 6d et seq, because the advisor was not registered as a futures commission merchant with the Commodity Futures Trading Commission. The District Court dismissed that count, finding that the advisor was not a futures commission merchant because the advisor merely acted as an advisor, placing orders with the registered commodity broker. 608 F.2d at 177. The Court of Appeals for the Fifth Circuit affirmed the District Court's dismissal of that count without comment. *Id.* at 178.

The *Rasmussen* opinion is insufficient to persuade the Court that Financial is not a futures commission merchant. The opinion does not present enough facts about the relationship between the advisor and its customers to show conclusively that Financial was in the same position as the advisor in that case. Furthermore, it does not provide a definition or standard for determining whether an entity is a futures commission merchant.

The next case that the Defendants cite is *In Re Bengal Trading Corp.*, 12 B.R. 695 (Bankr.S.D.Fla.1981). In that case a customer deposited money in a futures commission merchant's bank for trading purposes after the futures commission merchant had suspended trading operations because it no longer met the financial requirements for Commodities Futures Trading Commission registration. *Id.* at 696. The court found that the funds had to be returned to the customer because the futures commission merchant had ceased doing business as a futures commission merchant when the funds were deposited. *Id.*

*Bengal Trading* does not apply to the question of whether Financial is a futures commission merchant. The opinion only determined whether the funds deposited were part of the debtor/merchant's bankruptcy estate or returnable customer property. The decision did not turn on whether

Bengal was a futures commission merchant. It turned on whether Bengal was precluded by law from doing business as a futures commission merchant. Nowhere does the opinion present a definition of futures commission merchant and therefore, it is not applicable to the instant controversy.

The last case that the Defendants cite is *In Re Bucyrus Grain Co., Inc.*, 67 B.R. 336 (Bankr.D.Kan.1986). That case involved a grain company that placed commodity orders for a customer with a registered commodity broker. The customer asked the grain company to place the orders in order to take advantage of the special margin rates available to the grain company. The grain company did not receive a commission for the transactions. After the grain company filed for bankruptcy, the customer sought a determination that the grain company was a futures commission merchant so that the customer would have priority in a commodity broker liquidation under Chapter 7. *Id.* at 340.

The Bankruptcy Court determined that the grain company was not a futures commission merchant because it did not receive a commission for the transactions. *Id.* That decision was reversed by the District Court on the grounds that a commission is not required for an entity to be a futures commission merchant. *In Re Bucyrus Grain Co., Inc.*, 1988 U.S.Dist.LEXIS 7324.

The District Court in *Bucyrus Grain* approvingly cited the definition of futures commission set out in *In Re Co Petro Marketing Group, Inc.*, 680 F.2d 566 (9th Cir. 1982). *Id.* The *Co Petro* opinion requires that two conditions be met before an entity is considered a futures commission merchant. First, "the individual, association, partnership, corporation, or trust must be dealing in orders for the purchase or sale of a commodity for future delivery." 680 F.2d at 569. Second, "the commodity for future delivery must be on or subject to the rules of a contract market." *Id.*[1]

---

1. The Court notes that an appeal of the *Bucyrus Grain* case is pending in the Tenth Circuit. The Court, however, is strongly persuaded by the definition of futures commission merchant given by the Ninth Circuit in *Co Petro.*

Financial clearly satisfies both conditions of the definition of futures commission merchant as set forth by the Ninth Circuit in *Co Petro*. Financial dealt in orders for the purchase or sale of T-bill futures and those futures were on or subject to the rules of a contract market. Just as a commission is not required for an entity to be a futures commission merchant, neither is it required that an entity be a member of contract market.

Finally, the Court notes that the definition of futures commission merchant in the Commodity Exchange Act, 7 U.S.C. Section 2, is immediately preceded by the definition of "member of a contract market." If Congress had intended that only members of a contract market could be futures commission merchants then it would have included that defined term in the definition of futures commission merchant. In conclusion, because the Defendants failed to demonstrate any manifest errors in law or fact, the Defendants' Motion for reconsideration is denied.

IT IS HEREBY ORDERED that the Motion of the Defendants for Reconsideration and to Amend the Judgment is denied.