977 F.2d 255
 61 USLW 2185, Fed. Sec. L. Rep. P 97,016
 Myles M. SPICER, individually and as a partner of the Myles
and Richard Spicer partnership; John A. Brittain; and
Buys-MacGregor, MacNaughton, Greenwalt & Co., a corporation,
on behalf of themselves and all others similarly situated,
Plaintiffs-Appellants,
v.
CHICAGO BOARD OF OPTIONS EXCHANGE, INC., and Michael B.
Saltzman, et al., Defendants-Appellees.
 Nos. 91-1488, 91-1918.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 17, 1992.
Decided Sept. 24, 1992.
 
 Ronald L. Futterman, James G. Bradtke, Hartunian & Associates, Stephen B. Diamond, Beeler, Schad & Diamond, Philip Fertik, Herbert Beigel, Leigh R. Lasky (argued), Brian R. Worth, Beigel & Sandler, Chicago, Ill., Steve J. Toll, Cohen, Milstein & Hausfeld, Washington, D.C., Ron M. Landsman, Bethesda, Md., Edward T. Joyce, James X. Bormes, Paul A. Castiglione, Joyce & Kubasiak, Chicago, Ill., for plaintiffs-appellants.
 Lloyd A. Kadish, Kadish & Associates, Jerrold E. Salzman, Phillip L. Stern, Freeman, Freeman & Salzman, Kevin M. Flynn, Shelley R. Weinberg, Coffield, Ungaretti, Harris & Slavin, Harry P. Lamberson, David S. Barritt, Chapman & Cutler, Paul B. Uhlenhop, Charles J. Risch, Michael Wise, Lawrence, Kamin, Saunders & Uhlenhop, Joseph D. Keenan, III, Sklodowski, Franklin, Puchalski & Reimer, Robert A. Vanasco, Matthew D. Wayne, Fishman & Merrick, Aaron E. Hoffman, Schwartz & Freeman, Lawrence R. Samuels, Jacquelyn F. Kidder, Ross & Hardies, Garrett B. Johnson, Robert S. Steigerwald, David M. Matteson, Mark S. Bernstein, Kirkland & Ellis, David C. Bohan (argued), Jenner & Block, Roger Pascal, Burton R. Rissman, Paul E. Dengel (argued), Jeanne L. Nowaczewski, Amy S. Belcove, Schiff, Hardin & Waite, Chicago, Ill., for defendants-appellees.
 Before FLAUM and MANION, Circuit Judges, and CURRAN, District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 Section 6 of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78f (1988), governs, among other things, the registration of national securities exchanges with the Securities and Exchange Commission (the Commission). Subsection 6(b), id. § 78f(b), provides that the Commission may register an exchange only if the exchange has established rules to govern trading, internal operations, and the discipline of wayward exchange members, and has demonstrated the capacity to comply with those rules and enforce compliance by its members. The plaintiffs, who purchased securities on a national securities exchange, maintain that § 6(b) furnishes them an implied private right of action against members of the exchange who allegedly violated certain exchange trading rules, and against the exchange itself for failing to enforce compliance with those rules, and for violating, on its own accord, other exchange rules. We decline to announce a categorical rule regarding all potential private actions under this provision. We hold only that § 6(b) may never support a private suit against an exchange for violating or failing to enforce its own rules, and that it does not support an action against exchange members for violating the exchange rules at issue in this case.
 
 I.
 
 2
 This lawsuit, like many before it, arises from the ashes of Black Monday, the stock market crash of October 19, 1987. See, e.g., Ruffolo v. Oppenheimer & Co., 949 F.2d 33 (2d Cir.1991); DeBruyne v. Equitable Life Assurance Soc'y, 920 F.2d 457 (7th Cir.1990); Thomas McKinnon Sec., Inc. v. Clark, 901 F.2d 1568 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 678, 112 L.Ed.2d 670 (1991). The plaintiff class consists of all investors, other than the individual defendants, who purchased certain Standard & Poors 100 (S & P 100) index options during trading rotations at the Chicago Board of Options Exchange (CBOE) on October 20. The defendants are the CBOE, a national securities exchange registered to conduct options trading, and 35 individual "market-makers" in the S & P 100 pit, all of whom are CBOE members. Market-makers are individual traders appointed by the CBOE to maintain a fair, orderly and liquid market in one or more classes of option contracts. Their function is similar, although not identical, to that of "specialists" on national stock exchanges. The market-makers trade for their own account on the floor of the exchange, buying options from brokers representing investors who wish to sell, and selling options to brokers representing investors who wish to buy. Of the individual defendants here, 24 traded on the day in question and 11 did not; we shall refer to the two groups as the "participants" and the "nonparticipants," respectively.
 
 
 3
 On October 20, the plaintiffs issued "market orders"--meaning orders to buy (or, as the case may be but is not here, sell) S & P 100 options at the prevailing market price--to their brokers. The gravamen of their lawsuit is that when their brokers executed those orders, the participants, who sold the options, charged grossly inflated prices to recoup losses they had suffered the previous day. The CBOE, the investors allege, facilitated the participants' wrongdoing by violating the securities laws and certain CBOE rules, and by failing to enforce compliance by the market-makers with other exchange rules. The nonparticipants are also alleged to have facilitated the wrongdoing by failing to appear for trading on October 20, in violation of yet another CBOE rule.
 
 
 4
 The basis of the plaintiffs' lawsuit might appear odd from the perspective of commonly accepted finance principles. The price of an option is determined by a number of factors, one being the price volatility of the underlying security, see generally Julian Walmsky, The New Financial Instruments 156-61 (1988), which in this case is the S & P 100 stock index. October 19 and 20 were arguably the most volatile days in the history of the stock market. See Report of the Presidential Task Force on Market Mechanisms (The Brady Report), [1987-88 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 84,213. The S & P 100 stock index lost about 21% of its value on October 19; in the first two and one-half hours of trading on October 20, the Dow Jones Industrial Average experienced more than a 23% swing in value. In light of this unprecedented volatility, it should have come as no surprise that the price of S & P 100 index options was much higher than usual. But these observations are relevant primarily to liability and damages; at issue here is whether the plaintiffs' complaint states a valid cause of action under federal law.
 
 
 5
 The plaintiffs brought suit under the Securities Act of 1933 and the Exchange Act, and under state law for negligence and breach of fiduciary duty. The complaint sought relief from the market-makers under only one count, which alleged that they had violated § 6(b) of the Exchange Act by failing to comply with CBOE Rules 4.1 and 8.7. Likewise, one of the several counts against the CBOE alleged that it had violated § 6(b) by failing to enforce compliance by the market-makers with those rules, and by violating itself other CBOE rules. The district court dismissed both of these counts under Fed.R.Civ.P. 12(b)(6), reasoning that § 6(b) does not provide an implied private right of action (all agree that there is no express right of action) for the violation of or the failure to enforce exchange rules. Spicer v. Chicago Bd. Options Exchange, Inc., 1990 WL 172712, at * 3-17, 1990 U.S. Dist. LEXIS 14469, slip op. at 8-20 (N.D.Ill. Oct. 24, 1990) [hereinafter "Dist. Op."]. Although several counts against the CBOE and other defendants survived the motion to dismiss, the district court entered final judgment as to the § 6(b) counts under Fed.R.Civ.P. 54(b). We affirm.
 
 II.
 
 6
 About five years ago, in the context of another lawsuit brought by investors against an exchange and its members, we observed that the whole question of implied private rights of action "is deeply vexed," Bosco v. Serhant, 836 F.2d 271, 275 (7th Cir.1987), and for good reason. Weighty institutional and prudential concerns, which relate in large part to our role as an Article III body, pull in arguably inconsistent directions. On one hand, they counsel against too quickly recognizing causes of action for which Congress did not expressly provide. See Cannon v. University of Chicago, 441 U.S. 677, 730-49, 99 S.Ct. 1946, 1974-85, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting); George D. Brown, Of Activism and Erie-- Implication Doctrine's Implications for the Nature and Role of the Federal Courts, 69 Iowa L.Rev. 617, 644-49 (1984). Yet, at the same time, courts interpreting statutes are charged with effectuating their underlying intent, which Congress often chooses to convey through vehicles more subtle than statutory text. See Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979) (intent may appear implicitly in the structure of a statute or the circumstances of its enactment) [hereinafter "TAMA "]. An additional, and somewhat related, dilemma lies in the fact that divining from silence an intent to create or foreclose private actions, or for that matter an intent to do anything, is admittedly an inexact science. See In re Grabill Corp., 967 F.2d 1152 (7th Cir.1992); Luddington v. Indiana Bell Tel. Co., 966 F.2d 225 (7th Cir.1992); Mozee v. American Commercial Marine Serv. Co., 963 F.2d 929 (7th Cir.1992). Complicating matters further, the Supreme Court has yet to announce a completely consistent set of interpretive rules for doing so. Compare Touche Ross & Co. v. Redington, 442 U.S. 560, 571-72, 99 S.Ct. 2479, 2486-87, 61 L.Ed.2d 82 (1979) (where one section of a statute expressly provides a private remedy, there is a presumption against implying private actions in other sections of the same statute) with Herman & MacLean v. Huddleston, 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548 (1983) (rejecting presumption); see Erwin Chemerinsky, Federal Jurisdiction § 6.3.3, at 321-22 (1989).
 
 
 7
 In light of these concerns and difficulties, Justice Scalia has proposed that the judiciary "get out of the business of implied private rights of action altogether." Thompson v. Thompson, 484 U.S. 174, 191-93, 108 S.Ct. 513, 522-23, 98 L.Ed.2d 512 (1988) (concurring opinion). There are some indications from this past Term that his approach has gained the support of Chief Justice Rehnquist and Justice Thomas, Franklin v. Gwinnett County Public Schools, --- U.S. ----, ----, 112 S.Ct. 1028, 1039, 117 L.Ed.2d 208 (1992) (Scalia, J., concurring), although the extent of their support, if any, is far from clear. Regardless, a majority of the Court continues to adhere to the principle that the judiciary may recognize implied private rights of action under certain limited circumstances, see id. at ----, 112 S.Ct. at 1032; Karahalios v. National Fed'n of Fed. Employees, Local 1263, 489 U.S. 527, 532-33, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989); Thompson, 484 U.S. at 179-80, 108 S.Ct. at 516; and we proceed accordingly.
 
 
 8
 We do know some things for certain. The four-part test from Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),[1] survives, but only nominally. In recent years, the focus has shifted to the second Cort factor: whether Congress, in enacting the provision at issue, intended to create a private remedy. TAMA, 444 U.S. at 15-16, 100 S.Ct. at 245; Touche Ross, 442 U.S. at 568, 99 S.Ct. at 2485; Saltzman v. Farm Credit Servs., ACA, 950 F.2d 466, 468 (7th Cir.1991). In discerning Congress' intent, we look to several sources, some of which may overlap: the language and structure of the statute, TAMA, 444 U.S. at 18, 100 S.Ct. at 246; the circumstances of its enactment, id.; the legislative history, Karahalios, 489 U.S. at 533-34, 109 S.Ct. at 1286-87; Thompson, 484 U.S. at 181-82, 183-87, 108 S.Ct. at 517, 518-20, the contemporary legal context in which Congress acted, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381, 102 S.Ct. 1825, 1840, 72 L.Ed.2d 182 (1982); the first, third and fourth Cort factors, Thompson, 484 U.S. at 179, 108 S.Ct. at 516; and other tools of statutory construction. In sum, courts may not recognize an implied remedy absent persuasive evidence that Congress intended to create one. With these principles--and their attending uncertainties--in mind, we proceed to the case at hand. The plaintiffs are of course granted all of the benefits to which they are entitled in opposing a motion to dismiss.
 
 III.
 
 9
 We first examine whether § 6(b) grants investors a private right of action against an exchange for violating and failing to enforce exchange rules.[2] Any inquiry into congressional intent must begin with the language of the statute. TAMA, 444 U.S. at 16, 100 S.Ct. at 245; Touche Ross, 442 U.S. at 568, 99 S.Ct. at 2485. By its terms, § 6(a)[3] provides that an exchange may become registered by filing with the Commission an application that outlines, among other things, the rules of the exchange. Subsection 6(b),[4] by its terms, simply requires the Commission, before registering an exchange, to ensure that it has promulgated certain rules and has demonstrated a capacity to comply with and enforce compliance by its members with those rules.
 
 
 10
 We find no basis in the plain language of § 6(b) from which to infer a private right of action in favor of investors who allege that an exchange has violated of failed to enforce its own rules. The provision merely outlines the prerequisites of registration and the mechanics by which the Commission can grant registration. If § 6(b) imposes any affirmative legal duties, it does so on the Commission. See generally Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 129-31, 94 S.Ct. 383, 390-92, 38 L.Ed.2d 348 (1973). The provision neither confers rights on private parties nor proscribes any conduct by the exchanges as unlawful, a consideration which weighs heavily against finding an implied private remedy. Touche Ross, 442 U.S. at 569, 99 S.Ct. at 2485. Moreover, the legislative history of § 6 speaks not a word to the question of implied private remedies. This, when considered in conjunction with a negative indication from the statute's plain language, further weighs against implying a private remedy. Id. at 571, 99 S.Ct. at 2486.
 
 
 11
 Granted, § 6(b) states that an exchange seeking registration must promulgate certain rules and demonstrate the capacity to comply and enforce compliance with those rules. From this, it might appear a short step to infer in § 6(b) a requirement that a registered exchange actually do what it has demonstrated the capacity to do. Putting aside the question of whether inferring such a requirement would necessarily create a private remedy for its enforcement--as noted, it does not, see, e.g., Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); California v. Sierra Club, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); Touche Ross, supra--we cannot make this inference here. The reason is simple, and lies in "the statutory scheme of which [§ 6] is a part." Touche Ross, 442 U.S. at 571, 99 S.Ct. at 2486. A different provision of the Exchange Act enacted in 1975, § 19(g)(1), expressly requires an exchange to comply with, and enforce compliance by its members with, its own rules.[5] An interpretation that reads the same requirements into § 6(b) would render § 19(g)(1) superfluous, violating "the well-settled rule ... that all parts of a statute, if possible, are to be given effect." Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973). If we view the Exchange Act as an integrated whole, as we must, it is clear that Congress intended § 6(b) to deal only with the prerequisites of exchange registration, and § 19(g)(1) to impose an affirmative legal duty upon registered exchanges. The structure of the Act, then, reinforces our conclusion that § 6(b) does not create a private remedy against an exchange for violating or failing to enforce its own rules.
 
 
 12
 The plaintiffs direct a great deal of fire towards fitting this case within the rubric of Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, supra. Curran held that the Commodity Exchange Act (CEA), 7 U.S.C. § 1 et seq. (1976 and Supp. IV) (amended 1982), grants investors in the futures market an implied private right of action against brokers who violate the antifraud provisions of the CEA, and against commodity exchanges that fail to enforce their own rules against price manipulation. Congress did not expressly provide for a private remedy against these violations when it enacted the CEA in 1922; nor did it do so when it substantially revised the statute in 1974. Prior to 1974, however, federal courts interpreting the CEA had "routinely and consistently" implied such private rights of action. Curran, 456 U.S. at 379, 102 S.Ct. at 1839. The Court reasoned that because an implied private remedy under the CEA "was a part of the 'contemporary legal context' in which Congress legislated in 1974," Congress, by its silence, must have intended to preserve that remedy. Id. at 381-82, 102 S.Ct. at 1840-41 (quoting Cannon, 441 U.S. at 698-99, 99 S.Ct. at 1958); see also Huddleston, 459 U.S. at 384-86, 103 S.Ct. at 688-89. Put simply, if Congress had intended to foreclose such private remedies, it would have told the courts to stop implying them. Bosco, 836 F.2d at 275-76.
 
 
 13
 The plaintiffs contend that we face the same situation here. Congress did not expressly provide a private remedy under § 6(b) when it enacted the Exchange Act in 1934, and again did not do so when it comprehensively revised the Exchange Act, including § 6(b), in 1975. Prior to 1975, however, a number of federal courts, starting with Baird v. Franklin, 141 F.2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), had discovered in § 6(b) an implied remedy against national securities exchanges that violated their rules, or that knowingly failed to enforce compliance by their members with the same.[6] The fact that the revised version of § 6(b) does not address implied private remedies, the investors argue, means that Congress intended to leave undisturbed the contemporary legal landscape and preserve that remedy. The CBOE counters by arguing that Curran may be distinguished. One argument contends that recognition of an implied private remedy under § 6(b) prior to 1975 was not "routine and consistent" as the term is employed in Curran. A separate argument contends that the legislative history of the 1975 Amendments to the Exchange Act, unlike the history of the 1974 amendments to the CEA, contains not a single indication that Congress was cognizant of the fact that federal courts had been implying private remedies under § 6; it follows that Congress could not have conceivably intended to preserve a remedy of which it probably was unaware.
 
 
 14
 We need not resolve whether Curran is distinguishable on these two grounds, for even assuming it is not, the CBOE still prevails. Section 6(b) has been part of the Exchange Act from its inception in 1934, and was substantially revised when Congress amended the statute in 1975. Securities Acts Amendments of 1975, § 4, Pub.L. 94-29, 89 Stat. 97, 104-09 (1975). In 1975, Congress also enacted § 19(g)(1), which, as noted, explicitly imposes upon exchanges the duty to follow and enforce their own rules. Id. § 16, at 152. Thus, even assuming that the pre-1975 version of § 6(b) implicitly imposed the same duty, and approved of private actions to enforce that duty, the text of the 1975 Amendments clearly removes that duty from the scope of § 6(b) by placing it squarely (and explicitly) in § 19(g)(1). The legislative history reinforces our conclusion. S.Rep. No. 75, 94th Cong., 1st Sess. 133 (1975), reprinted in 1975 U.S.C.A.A.N. 179, 310 ("This subsection [§ 19(g)(1) ] make[s] explicit the duty of each self-regulatory organization to comply with ... its own rules [and to] enforce compliance ... by its members.") (emphasis supplied).
 
 
 15
 Accordingly, Curran does not govern this portion of the case. To the extent, if any, that § 6(b) once provided an implied remedy against an exchange for failing to comply with or enforce its own rules, the 1975 Amendments conclusively demonstrate that Congress did not intend to preserve that remedy, at least in § 6(b). This ends our inquiry, Sierra Club, 451 U.S. at 298, 101 S.Ct. at 1781-82; Touche Ross, 442 U.S. at 576, 99 S.Ct. at 2489; King v. Gibbs, 876 F.2d 1275, 1281 (7th Cir.1989), so we need not address the CBOE's well-taken contentions regarding its status as a self-regulatory organization, or the place of § 6(b) in the regulatory scheme that governs the behavior of national securities exchanges. We hold that the district court properly dismissed the § 6(b) count against the CBOE, and leave for another day the issue of whether § 19(g)(1) grants an analogous private action.[7]IV.
 
 
 16
 We next consider whether § 6(b) grants the plaintiffs an implied right of action against the market-makers for their alleged violation of certain CBOE trading rules. The plaintiffs maintain that the participants, in violation of CBOE Rules 4.1 and 8.7, fraudulently charged exorbitant prices for S & P 100 index options during trading on October 20, 1987. They also allege that the non-participants willfully breached CBOE Rule 8.7 by failing to appear and trade for their accounts on that day. These violations, the investors contend, are actionable in federal court under § 6(b)(5).
 
 
 17
 Such a contention surely cannot rest upon the plain language of that statute. Section 6(b)(5) provides that the Commission may not register an exchange unless it has promulgated rules designed to prevent fraudulent practices, promote just and equitable principles of trading, perfect the mechanism of a free and open market, and the like. 15 U.S.C. § 78f(b)(5) (quoted at footnote 4, supra ). True, § 6(b)(5) is tangentially related to the actions of exchange members, a group which includes market-makers; it requires that an exchange, as a prerequisite to registration, establish rules prohibiting fraudulent practices by its members. But that is a far cry from providing a private remedy for an exchange member's violation of those rules. As we discussed earlier, the provision pertains solely to the registration of national securities exchanges, and does not confer any rights upon private parties. More important, it does not make unlawful any act or omission by an exchange member. Touche Ross, 442 U.S. at 569-71, 99 S.Ct. at 2485-86. By its terms, then, § 6(b)(5) provides no basis upon which we can discern Congress' intent to imply a private remedy of the sort sought by the plaintiffs.
 
 
 18
 The legislative history of § 6(b) is silent on this issue, which compels the plaintiffs once again to turn to Curran. They contend that when Congress enacted the 1975 Amendments to the Exchange Act, federal courts had routinely and consistently held that § 6 granted an implied remedy against exchange members who violated internal rules designed to protect investors. The market-makers respond that Curran may be distinguished, and rely upon many of the same points raised by the CBOE. We earlier sidestepped some difficult issues raised by the CBOE and the investors regarding the meaning of "routine and consistent" under Curran because § 19(g)(1) made their resolution unnecessary. Here, we are afforded no such luxury, for Congress has not enacted a provision, analogous to § 19(g)(1), explicitly requiring exchange members to comply with exchange rules.
 
 
 19
 Curran held, among other things, that Congress, in amending the CEA in 1974, intended by its silence to preserve a judicially recognized private remedy against commodity exchanges that do not enforce their own rules regarding price manipulation. As an original matter, one could construe this holding either broadly or narrowly. Read broadly, Curran stands for the proposition that Congress intended to create an implied private cause of action for a commodity exchange's failure to enforce any exchange rule. Read narrowly, it recognizes a private remedy only in those types of cases that had been the subject of private actions prior to the 1974 amendments. By way of illustration, suppose that a commodities exchange had two rules, A and B. Suppose further that before 1974 courts had consistently granted an implied remedy for investors harmed by an exchange member's violation of Rule A, but had not considered whether a similar action would lie for a violation of Rule B. A broad reading of Curran would hold that the 1974 amendments to the CEA had preserved a private remedy for the violation of Rules A and B, while a narrow reading would recognize a remedy only for the violation of Rule A.
 
 
 20
 Courts following Curran, including our own, have adopted the narrow approach. See Marshall v. Green Giant Co., 942 F.2d 539, 544-45 (8th Cir.1991); Cardoza v. Commodity Futures Trading Comm'n, 768 F.2d 1542, 1554-56 (7th Cir.1985); Sam Wong & Son, Inc. v. New York Mercantile Exchange, 735 F.2d 653, 669 (2d Cir.1984); cf. Bosco, 836 F.2d at 275-76 (recognizing narrow approach, while proposing alternative explanation for the result reached in Cardoza and Sam Wong ) (dicta). Cardoza, distinguishing Curran, refused to recognize an implied private remedy based upon a commodity exchange's failure to enforce its own rules regarding eligibility for membership and membership disputes. We reasoned that prior to 1974 federal courts had not entertained any private actions involving these types of exchange rules under the CEA--let alone "routinely and consistently," as required by Curran, 456 U.S. at 379, 102 S.Ct. at 1839--and had, in fact, expressly refused to do so in one instance. Cardoza, 768 F.2d at 1554-56. The Second Circuit in Sam Wong refused on analogous grounds to recognize a private remedy for a commodity exchange's failure to propose amendments to certain futures contracts. Sam Wong, 735 F.2d at 669.
 
 
 21
 We apply the narrow approach here, not only for the sake of adhering to precedent, but also because it best resolves the mild tension between the competing institutional and prudential concerns to which we referred earlier. Implying private remedies is hardly an exact science. Words are ambiguous enough, see, e.g., United States v. Burke, --- U.S. ----, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992), silence even more so, and the greater the ambiguity, the more potentially free and unfettered the interpretation. Of course the familiar tools of statutory construction shed light on the search for implied remedies, and in so doing guide our interpretation, but they take us only so far; Curran provides further direction, but leaves some uncertainties of its own. In resolving the uncertainty presented here--should Curran be read broadly or narrowly--it is best to return to first principles. As an Article III body, our role when interpreting statutes is to implement the will of Congress. Tennessee Valley Authority v. Hill, 437 U.S. 153, 194-95, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978). It follows that courts implying private remedies, particularly in a statute whose legislative history is silent, must ensure that they not cross the fine, and at times obscure, line between implementing Congress' will and usurping its Article I powers. Touche Ross, 442 U.S. at 568, 99 S.Ct. at 2485. Reading Curran broadly, we believe, would create too great a risk of crossing that line.[8] Moreover, if we are to infer that Congress, when amending a statute, silently intended to preserve remedies "routinely and consistently" recognized by the judiciary in the past, we must also infer that it intended to shut out the remedies that were not so recognized.
 
 
 22
 Unresolved questions linger even under the narrow approach. Consider once again the imaginary commodity exchange rules discussed above. Assuming that a private right of action lies for a violation of Rule A, will one also lie for a violation of a similar, though not identical, rule of a different exchange? If so, how similar to Rule A must that rule be? To decide the case sub judice, we need not enter this thicket; the legal landscape surrounding passage of the 1975 Amendments was (sparsely) populated with successful cases that bear little, if any, resemblance to the one the investors have brought against the market-makers. Colonial Realty Corp. v. Bache & Co., 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), was the first case to suggest that § 6(b) provided an implied cause of action against an exchange member for violating certain exchange rules. It declined nonetheless, for reasons we need not explore, to recognize an implied remedy for a member's violation of an exchange rule requiring members to "observe high standards of commercial honor and just and equitable principles of trade." Id. at 182-83.
 
 
 23
 Although Colonial Realty opened the door, very few courts prior to the 1975 Amendments had occasion to address which exchange rules, if violated by a member, could support a private right of action under § 6(b). Only one discernible line of cases, starting with Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir.), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), could possibly constitute a "routine and consistent" recognition of an implied remedy; they provide that an investor can seek redress in federal court for a member's fraudulent violation of New York Stock Exchange Rule 405,[9] widely referred to as the "know your customer" rule. See, e.g., Geyer v. Paine, Webber, Jackson & Curtis, Inc., 389 F.Supp. 678, 683 (D.Wyo.1975); Starkman v. Seroussi, 377 F.Supp. 518, 524 (S.D.N.Y.1974); Aetna Casualty & Surety Co. v. Paine, Webber, Jackson & Curtis, [1969-70 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 92,748, 1970 WL 274 (N.D.Ill.1970) (while recognizing Buttrey, finding no right of action for negligent violation of Rule 405); cf. Landy v. Federal Deposit Ins. Corp., 486 F.2d 139, 164-67 (3rd Cir.1973) (criticizing holding in Buttrey while disposing of case on other grounds), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); Jenny v. Sheason, Hammill & Co., Inc., [1974-75 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 95,021, 1975 WL 364 (S.D.N.Y.1975) (holding that no right of action for negligent violation of Rule 405, without recognizing Buttrey ); State of Utah v. duPont Walston, Inc., [1974-75 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 94,812, 1974 WL 450 (D.Utah 1974) (same).[10] There are a smattering of other cases, some successful and others not, but none that fit any pattern, consistent or otherwise.
 
 
 24
 Against this backdrop, it should be clear that Congress, in amending the Exchange Act, did not intend to provide an implied remedy under § 6(b) for the exchange rule violations alleged in this case. The plaintiffs, as noted, charge that the participants violated CBOE Rules 4.1 and 8.7(a) by fraudulently charging exorbitant and unreasonable prices for certain index options. We assume at this stage of the litigation that their charge is accurate. Rule 4.1 provides that exchange members shall not "engage in acts or practices inconsistent with just and equitable principles of trade." Rule 8.7(a) provides that market makers should engage in transactions that "constitute a course of dealings reasonably calculated to contribute to the maintenance of a fair and orderly market." The investors do not cite, nor did our research discover,[11] any case recognizing an implied remedy under § 6(b)(5) for the violation of an exchange rule similar to either Rule 4.1 or 8.7(a). In fact, Rule 4.1 is nearly identical to the "just and equitable principles of trade" rule Colonial Realty held could not support an implied private remedy. Rule 8.7(a), while worded somewhat differently, is also a vague, "catch-all" standard whose enforcement Colonial Realty thought best left to the exchanges. Colonial Realty, 358 F.2d at 182-83. The fact that Colonial Realty--which, incidentally, is acknowledged as the seminal case in this area--squarely refused to recognize an implied remedy for the violation of rules similar in all relevant respects to Rules 4.1 and 8.7(a) precludes any finding that courts had "routinely and consistently" recognized such remedies prior to the 1975 Amendments. Cardoza, 768 F.2d at 1554-56.
 
 
 25
 The investors also charge that the non-participants violated CBOE Rule 8.7(b) by failing to appear and trade for their accounts on the day following Black Monday. The non-participants concede that they did not show up for trading, and we assume without deciding that this constitutes a violation of Rule 8.7(b). Nonetheless, the investors again do not cite, nor could we find, any pre-1975 case recognizing an implied remedy against an exchange member for anything remotely resembling this conduct. See footnote 11, supra (citing sources). Nor do they contend that Rule 8.7(b) is in any way analogous to New York Stock Exchange Rule 405 for which the Buttrey line of cases had recognized an implied remedy. This concedes any argument --an argument that would have been extremely difficult to make in any event--that the two rules are so similar that Congress, in preserving a remedy for violations of Rule 405, also intended to create a remedy for violations of Rule 8.7(b).
 
 
 26
 The investors do contend, however, that we should recognize an implied action for the knowing violation of "important, non-discretionary" exchange rules, a class of which they assert Rule 8.7(b) is a member. They glean the term in quotations from our discussion in Bosco, 836 F.2d at 278, regarding implied private actions under the CEA. Granted, there are similarities between Bosco and the present case, as both involve implying private remedies in favor of investors for the violation of exchange rules. The similarities, however, go only so far, and do not extend to the type of exchange rules whose violation permits aggrieved individuals to sue in federal court. The reason is simple: When determining which implied actions Congress intended to preserve when it amended the CEA in 1974, Bosco examined an entirely different body of case law than we examine today in determining which (if any) implied actions Congress intended to preserve when it amended the Exchange Act in 1975. The fact that Bosco ultimately found in the CEA an implied remedy for the violation of "important, non-discretionary" rules is immaterial for our purposes. While Bosco 's method of performing legal archaeology may be relevant here, the cases unearthed by its excavation are not.
 
 
 27
 We hold, in conclusion, that § 6(b) does not grant an implied private right of action to investors who charge that market-makers, or any exchange member, violated CBOE Rules 4.1, 8.7(a) or 8.7(b). In so doing, we reserve judgment on broader issues resolved by the Eleventh and Ninth Circuits. See, e.g., Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413, 1419 (11th Cir.1983) (no private right of action for violation of the "know your customer" rule); Jablon v. Dean Witter & Co., 614 F.2d 677, 679-81 (9th Cir.1980) (no private right of action for violation of any exchange rule).
 
 
 28
 AFFIRMED.
 
 
 
 *
 The Honorable Thomas J. Curran, Eastern District of Wisconsin, sitting by designation
 
 
 [1]
 The Cort test reads in encapsulated form:
 In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 Cort, 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis in original) (citations omitted).
 
 
 [2]
 Of the few district courts, including the court in this case, that have reached this issue, all agree that the current version of § 6--meaning, as we shall see later, the post-1975 version--does not grant such a remedy. See, e.g., Ferreri v. Mainardi, 690 F.Supp. 411, 413 (E.D.Pa.1988); Kakar v. Chicago Bd. Options Exch., Inc., 681 F.Supp. 1039, 1043 (S.D.N.Y.1988); Gustafson v. Strangis, 572 F.Supp. 1154, 1158 (D.Minn.1983). One district court, to our knowledge, has broken the consensus, but only in dictum. Rich v. New York Stock Exch., Inc., 509 F.Supp. 87, 89 (S.D.N.Y.1981). Turning to the courts of appeal, the Third Circuit, in dicta, concluded that § 6 does not provide a private remedy for an exchange that violates or fails to enforce its own rules. Walck v. American Stock Exch., Inc., 687 F.2d 778, 786-88 (1982), cert. denied, 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983). The Second Circuit was presented with the issue, but avoided it. Brawer v. Options Clearing Corp., 807 F.2d 297, 299 n. 2 (1986), cert. denied, 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987). Finally, two circuits, in a related context, have ruled that § 6 does not grant a private remedy against exchange members that violate exchange rules. Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413, 1419 (11th Cir.1983); Jablon v. Dean Witter & Co., 614 F.2d 677, 679-81 (9th Cir.1980)
 
 
 [3]
 This provision reads:
 (a) An exchange may be registered as a national securities exchange under the terms and conditions hereinafter provided in this section and in accordance with the provisions of section 78s(a) of this title, by filing with the Commission an application for registration in such form as the Commission, by rule, may prescribe containing the rules of the exchange and such other information and documents as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78f(a).
 
 
 [4]
 This provision reads in relevant part:
 (b) An exchange shall not be registered as a national securities exchange unless the Commission determines that--
 (1) Such exchange is so organized and has the capacity to ... comply, and ... to enforce compliance by its members and persons associated with its members, with ... the rules of the exchange....
 (5) The rules of the exchange are designed to prevent fraudulent and manipulative practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers....
 (6) The rules of the exchange provide that ... its members and persons associated with its members shall be appropriately disciplined for violation of ... the rules of the exchange....
 15 U.S.C. § 78f(b).
 
 
 [5]
 Section 19(g)(1) provides in relevant part:
 (g)(1) Every self-regulatory organization shall comply with the provisions of ... its own rules, and ... absent reasonable justification or excuse enforce compliance--
 (A) in the case of a national securities exchange, with such provisions by its members and persons associated with its members....
 15 U.S.C. § 78s(g)(1) (1988).
 
 
 [6]
 See, e.g., Butterman v. Walston & Co., 387 F.2d 822 (7th Cir.1967) (failure to enforce compliance with rules by members), cert. denied, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968); Marbury Mgmt., Inc. v. Alfred Kohn, Wood, Walker & Co., 373 F.Supp. 140 (S.D.N.Y.1974) (same); Hughes v. Dempsey-Tegeler & Co., Inc., [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 94,133, 1973 WL 421 (C.D.Cal.1974) (same), aff'd, 534 F.2d 156 (9th Cir.1976); Caddell v. Goodbody & Co., [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 93,938, 1972 WL 371 (N.D.Ala.1972) (same); Bright v. Philadelphia-Baltimore-Washington Stock Exch., 327 F.Supp. 495 (E.D.Pa.1971) (violating own rules). The pre-1975 case law is explored in greater detail in Glenn A. Guarino, Annotation, Availability of Implied Private Right of Action Against Stock Exchanges under § 6 of the Securities Exchange Act of 1934 (15 USCS § 78f), 72 A.L.R.Fed. 101 (1985); E.C. Lashbrooke, Jr., Implying a Cause of Action for Damages: Rule Violations by Registered Exchanges and Associations, 48 U.Cin.L.Rev. 949, 949-50, 953-55 (1979); and Lewis D. Lowenfels, Implied Liabilities Based Upon Stock Exchange Rules, 66 Colum.L.Rev. 12, 19-24 (1966)
 
 
 [7]
 The district court addressed the issue of whether § 19(g)(1) grants an implied remedy against the CBOE, and concluded that it did not. Dist. Op. at 20. Its decision to reach § 19(g)(1) seems to have been based upon an extremely charitable reading of the plaintiffs' complaint. That complaint mentions § 19(g)(1) only once, in the section entitled "Jurisdiction and Venue," see Pl.'s Fifth Amended Complaint p 2 (Jan. 5, 1990), not in Count II, which deals with the CBOE's alleged violation of and failure to enforce compliance with exchange rules, and does not in any way refer to § 19(g)(1). See id. p 54. The district court gave the plaintiffs a break by reading their complaint to allege a cause of action under § 19(g)(1), although the break ultimately was to no avail. Even assuming that the complaint advanced a claim under § 19(g)(1), the plaintiffs clearly abandoned it on appeal. Their brief mentions § 19(g)(1) only once, and even then only in the context of reviewing the district court's ruling in the "Statement of Facts" section. Pl.'s Br. at 12. The body of the brief contends only that § 6 grants an implied right of action. Id. at 15-33. It is for this reason that we addressed only the question of implied remedies under § 6, although we observe here in passing that the district court, in all likelihood, correctly ruled on the § 19(g)(1) issue
 
 
 [8]
 Even a narrow reading does so in cases, such as this one, where the legislative history does not demonstrate that Congress was aware that courts had been implying private remedies. Curran placed great emphasis on the fact that Congress, when amending the CEA in 1974, was familiar with the pre-1974 implied private remedy; this supported the Court's inference that Congress' silence evinced an intent to preserve that remedy. Curran, 456 U.S. at 382-88, 102 S.Ct. at 1841-44. Here, nothing in the legislative history of the 1975 Amendments to the Exchange Act demonstrates that Congress was familiar with the implied private remedies under § 6(b); this certainly weakens any inference that Congress intended by its silence to preserve that remedy. It is not clear whether this condemns private rights of action under the post-1975 version of § 6(b) outright. Compare id. (emphasizing Congress' familiarity with implied private remedies under the CEA) with id. at 382 n. 66, 102 S.Ct. at 1841 n. 66 (" 'where ... Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.' ") (quoting Lorillard v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978)). We need not resolve that issue here, for even assuming that congressional awareness of judicially recognized implied private remedies under § 6(b)(5) is not the sine qua non of their preservation in the 1975 Amendments, the plaintiffs still do not prevail
 
 
 [9]
 At all relevant times, Rule 405 read in pertinent part:
 Every member organization is required through a general partner or an officer who is a holder of voting stock to
 (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organizations.
 (2) Supervise diligently all accounts handled by registered representatives of the organization.
 (3) Specifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer....
 Buttrey, 410 F.2d at 141 (quoting New York Stock Exchange Rule 405).
 
 
 [10]
 Landy casts grave doubt upon any contention that a private right of action for the violation of Rule 405 had been "routinely and consistently" recognized by the courts prior to the 1975 Amendments. In finding an implied remedy in the post-1974 version of the CEA, Curran observed that prior to 1974, "federal courts and federal practitioners ... simply assumed that the remedy was available." Curran, 456 U.S. at 380, 102 S.Ct. at 1840. Landy did not "simply assume[ ]" that a remedy was available for the violation of Rule 405; it declined to decide the issue, while at the same time criticizing Buttrey 's recognition of such a remedy. We have no occasion to consider here whether Landy sinks any implied right of action for the violation of Rule 405; we assume that it does not, and resolve this case on narrower grounds
 
 
 [11]
 The pre-1975 case law is discussed extensively in Eunice A. Eichelberger, Annotation, Private Federal Right of Action Against Brokerage Firm for Violation of Exchange or Dealer Association Rule, 54 A.L.R.Fed. 11, 11-49, 62-64 (1981); Patrick H. Allen, Liability Under the Securities Exchange Act for Violation of Stock Exchange Rules, Bus.Law. 1493, 1496-1500 (July 1970); Phillip J. Hoblin, Jr., A Stock Broker's Implied Liability to Its Customer for Violation of a Rule of a Registered Stock Exchange, 39 Ford.L.Rev. 253, 258-68 (1970); Nicholas Wolfson & Thomas A. Russo, The Stock Exchange Member: Liability for Violation of Stock Exchange Rules, 58 Calif.L.Rev. 1120, 1126-35 (1970); Lowenfels, supra, at 21-24